PERRY A. MARCH,                 )
                               )

      Petitioner,            )
                               )

v.                           )        Case No. 3:12-cv-270
                               )

DAVID SEXTON, Warden,     )        Judge Sharp
                               )

      Respondent.        )

## MEMORANDUM OPINION

Petitioner Perry A. March was convicted and sentenced by the Criminal Court for Davidson County, Tennessee in Nashville after a jury trial in 2006, and is presently an inmate at Northeast Correctional Complex in Mountain City, Tennessee. His *pro se* petition under 28 U.S.C. § 2254 for a writ of habeas corpus was initially filed in the United States District Court for the Eastern District of Tennessee, but was transferred to this district. This Court has jurisdiction. 28 U.S.C. § 2241(d).

## I.      BACKGROUND AND PROCEDURAL HISTORY

A Davidson County jury found petitioner Perry March guilty on one count of conspiracy to commit first-degree murder and two counts of solicitation to commit first-degree murder on June 8, 2006. At sentencing on September 6, 2006, the trial court merged the solicitation convictions into the conviction for conspiracy to commit first-degree murder, and sentenced March as a Range I, standard offender, to twenty-four years' imprisonment. The trial court ordered the petitioner to serve his sentence consecutively to sentences meted out the same day on the petitioner's convictions for second-degree murder, abuse of a corpse, and destruction of evidence, for a total effective sentence of fifty-six years' imprisonment. March was denied relief on direct appeal. *State v. March*, No. M2007–00701–CCA–R3–CD, 2010 WL 2219419 (Tenn. Ct. Crim. App. June 2, 2010). The Tennessee Supreme Court denied March's request for permission to appeal on November 17, 2010. March did not seek post-conviction relief in the state courts.

On November 16, 2011, March filed his *pro se* petition for the writ of habeas corpus (ECF No. 2) in the United States District Court for the Eastern District of Tennessee. The case was transferred to this Court as the appropriate venue. Shortly thereafter, the Court conducted a preliminary examination of the

petition and determined that it stated colorable claims for relief. Accordingly, the Court entered an order (ECF No. 22) directing the respondent to answer, plead or otherwise respond to the petition. Rule 4, Rules Gov'g § 2254 Cases. The respondent filed its answer to the petition on July 20, 2012 (ECF No. 43), along with copies of the underlying state-court record (ECF Nos. 44–47, 51).

The issues raised in March's petition are as follows:

1. Whether there was a fatal variance between the proof adduced at trial and the allegations made in Count One of the indictment, resulting in a violation of the petitioner's right to a fair trial and due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

2. Whether the jury instructions allowed the jury to convict the petitioner of conspiracy to commit first-degree murder based on an agreement with a government agent, violating the petitioner's right to a fair trial and due process of law, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments.

3. Whether the trial court erred in refusing to grant a mistrial after Lawrence Levine repeatedly told the jury that the petitioner had previously attempted to kill Levine and his wife, thereby violating the petitioner's right to a fair trial and due process of law, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments.

4. Whether the cumulative effect of the errors at trial rendered the petitioner's trial fundamentally unfair, in violation of the petitioner's right to a fair trial and due process of law, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments.

(ECF No. 2, at 4–6, 11–22.)[1]

Upon consideration of the petition, the answer, and the expanded record, the Court finds that an evidentiary hearing is not needed in this matter. *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003) (an evidentiary hearing is not required when the record conclusively shows that the petitioner is not entitled to relief). The Court will dispose of the petition as the law and justice require. Rule 8(a), Rules Gov'g § 2254 Cases.

---

[1] March also raised a fifth ground for relief in his petition (addressing whether the trial court improperly enhanced the petitioner's sentence on the basis of the petitioner's prior conviction for theft, which itself was unconstitutional). (*See* ECF No. 2, at 6.) In his Motion to Appoint an Attorney Prior to Seeking Leave to Amend Petition, however, March conceded that "Claim 5 has never been submitted to the Tennessee State Courts for their consideration." (ECF No. 78, at 1.) The Court will therefore not address this claim.

## II. FACTUAL BACKGROUND

The Tennessee Court of Criminal Appeals, in the opinion affirming the judgment of the trial court, summarized the factual history in the state courts as follows:[2]

> Carolyn Levine testified that she had been the wife of Lawrence Levine for forty-five years. They had two children, Mark Levine and Janet March. Mrs. Levine was the grandmother of Sammy and Tzipi March, the children of Janet March and the defendant. Mrs. Levine stated that she first met the defendant in the early 1980s at the University of Michigan, where he and Janet were students. After they graduated, Janet and the defendant married in 1987. Mrs. Levine testified that she and her husband provided financial support to Mrs. March and the defendant, including paying his law school tuition, giving them a house, helping in the finance of a new home, and a yearly $10,000 gift to each of them. Mrs. Levine further testified that she and her husband had financially assisted the defendant's father, Colonel Arthur March. She stated that they purchased his home, which was in foreclosure, and allowed him to continue to live in it. After he moved to Nashville, they also allowed Colonel March to stay in their home until he could find an apartment. Mrs. Levine said that Colonel March moved from Nashville to Ajijic, Mexico in 1993.
>
> Mrs. Levine testified that on August 15, 1996, Mrs. March "suddenly disappeared, and [they] never heard from her again." According to Mrs. Levine, Mrs. March and the defendant "were having severe marital problems, and Janet had planned to see a divorce attorney" the day before her disappearance. No one has found Mrs. March's body. Mrs. Levine said that the defendant and his children went to Chicago after Mrs. March's disappearance. Eventually the defendant moved to Mexico and remarried.
>
> Mrs. Levine said that before Mrs. March's disappearance, she "cared about [the defendant] a lot" and "treated him like [her] own son." Their relationship "deteriorated" after Mrs. March's disappearance. After the defendant went to Chicago, the Levines filed for grandparents' visitation in Illinois because the defendant did not allow them to see their grandchildren. The defendant and the Levines were involved in litigation concerning visitation rights, custody of the children, Mrs. March's estate, and Mrs. March's disappearance. Mrs. Levine testified that the court granted her and her husband temporary custody of their grandchildren in August 2005.
>
> Mrs. Levine recalled when authorities arrested the defendant for Mrs. March's murder and stated that she was listed as a witness on the indictment. She also stated that she assisted authorities during the conspiracy investigation. According to Mrs. Levine, the authorities told the Levines "not to answer the phone because someone may be checking to see if [they] were alive."
>
> On cross-examination, Mrs. Levine testified that she and her husband had been living in Nashville, [Tennessee] since 1961. Her husband was a successful attorney who had been practicing in Nashville since they moved there. She said that the home that Mrs. March and the defendant built after they were married was in Mrs. March's name only. Mrs. Levine testified that at the time of Mrs. March's disappearance, she and the defendant would visit each other's homes, and she and her husband would spend time

---

[2] State appellate court findings of fact can constitute factual findings in a habeas action. *See, e.g., Girts v. Yanai*, 501 F.3d 743, 749 (6th Cir. 2007) ("'In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'" (quoting 28 U.S.C. § 2254(e)(1))).

with their grandchildren. She said that it was "about two weeks" before her husband and the defendant reported Mrs. March missing.

Vickie Renee Farris testified that Russell Nathaniel Farris is her oldest child. Mr. Farris was an inmate at the Criminal Justice Center in Davidson County. She stated that when she visited him in September 2005, she became concerned about something he told her and called Lawrence Levine. She stated that she did not know Mr. Levine, but she "was concerned that . . . something could happen. . . ." Ms. Farris "felt like . . . someone needed to go see her son." She stated that she called Mr. Levine instead of the police because she "didn't trust the police." She further stated that she called Mr. Levine on her own, and no one instructed her to call him.

Lawrence Levine testified that he was married to Carolyn Levine. He identified the defendant and stated that the defendant and his daughter were married. He further stated that they got married while the defendant was attending Vanderbilt Law School, and he and his wife "paid for his room, board, tuition and books" while he was there. Mr. Levine said that the defendant worked at his law firm from 1991 to 1996, and the defendant was working at his law firm when Mrs. March disappeared. Mr. Levine and his wife were both witnesses against the defendant in his second-degree murder case.

Mr. Levine stated that he reviewed transcripts of recorded conversations between the defendant and Nathaniel Farris. He further stated that the information contained in the transcripts concerning where he and his family lived and the location of his office was accurate. Mr. Levine said that the transcripts also contained information about their temporary residence. According to Mr. Levine, he "received a phone call from a woman, who at first was reluctant to identify herself to [him]." He said that "she explained that she had some information about Perry March in jail and that she was afraid to go to the police, because she didn't trust the police." Mr. Levine could not recall whether she gave her son's name because he received many phone calls concerning his daughter after her disappearance. Mr. Levine said that he called the district attorney's office and told them that the woman had "important information about Perry March." The district attorney's office did not immediately inform him about the content of the information, and he did not find out about the plot to kill him and his wife until weeks later. After he received the information, Mr. Levine said that they "took precautions, [be]cause [they] were scared. This was not the first time Perry and Arthur March had attempted to kill [them]; so, [they] were scared."

Defense counsel contemporaneously objected to Mr. Levine's testimony regarding the defendant and Colonel March's previous attempts to kill the Levines and asked for a curative instruction. In a bench conference that followed, defense counsel moved for a mistrial. The court denied the defendant's motion for a mistrial, sustained the objection, and instructed the jury to disregard Mr. Levine's statements. At the end of the bench conference, the examination of Mr. Levine resumed.

On cross-examination, Mr. Levine stated that he and his wife helped the defendant, the defendant's sister, and Colonel March financially because "[Mrs. March] loved [the defendant] and she wanted to do everything she could to help [the defendant] and his family. Mr. Levine agreed that the phone book listed his home and work addresses, and anyone could get them. He testified that after Mrs. March's disappearance, the defendant stayed at his home in Nashville before moving to Chicago. Mr. Levine denied telling the defendant not to return to the home.

Mr. Levine said he had sued the defendant to gain custody of his grandchildren. Mr. Levine testified that the children lived in Mexico during 2000, and he went to Mexico to get the children from Mexico pursuant to a court order.

The prosecutor interrupted Mr. Levine's testimony for a bench conference and

warned that if defense counsel continued to question Mr. Levine about when he went to Mexico and got the children for a visit, then Mr. Levine would "say that Arthur March had a gun and threatened them and chased them and all that stuff." Defense counsel expressed concern regarding Mr. Levine's unresponsiveness to his questions. After the bench conference, the judge instructed Mr. Levine not to bring out further information that he thought was relevant and that "if the [s]tate is of the opinion that they need to solicit from [him] further relevant information" then they will do so during direct testimony. Defense counsel resumed cross-examination of Mr. Levine.

Mr. Levine stated that "a Mexican court, a Mexican judge, an American and an Illinois judge, and a court order" gave him permission to get the children from Mexico. Mr. Levine further stated that the order authorized visitation for thirty-nine days. He said that he "went to Mexico. The children were turned over to [them] by a Mexican judge and the Mexican police; and, when that happened, [he] saw the children." Eventually a federal court ruled that Mexico had jurisdiction to decide child custody and ordered that the Levines return the children to Mexico.

When asked whether the relationship between his family and the defendant was strained at the time the federal court ordered that they must return the children to Mexico, Mr. Levine responded "Yes. It was . . . that trip to Mexico, when [the defendant] and his father attempted . . . to kill us." The court attempted to interrupt Mr. Levine and prevent him from testifying that the defendant and Colonel March attempted to kill him. The judge again advised Mr. Levine to "[j]ust answer the questions." Defense counsel renewed their earlier motion for a mistrial. The judge denied the renewed motion and the cross-examination resumed.

Mr. Levine testified that the children resided in Mexico with the defendant until authorities charged the defendant with the homicide of Mrs. March in 2005. He denied doing everything that he could to hurt the defendant after Mrs. March's disappearance and denied attempting to take his law license. In addition, Mr. Levine denied personally filing a complaint against the defendant with the Board of Professional Responsibility, but he admitted that his firm may have filed a complaint. Mr. Levine recalled suing the defendant for custody of the children, Mrs. March's wrongful death, and taking property from Mrs. March's estate. He also stated that besides these lawsuits, he also filed two lawsuits for visitation with the children. Mr. Levine denied filing an additional lawsuit against the defendant and claimed that his firm and "other organizations and people" filed a complaint against the defendant.

Mr. Levine testified, on redirect examination, that the phone book did not list his grandchildren's school or the address and telephone number of his temporary apartment. Mr. Levine said that he knew that the defendant was disbarred, and that his license was revoked for theft. He recalled that the defendant initiated five lawsuits against him and his wife. According to Mr. Levine, the defendant was not successful in any of the lawsuits involving money.

Justin Johnson, a Tennessee criminal defense and personal injury lawyer, testified that he represented Russell Nathaniel Farris. He stated that Mr. Farris had been incarcerated since he began representing him for attempted first degree murder and two aggravated robbery charges. Mr. Johnson stated that on October 3, 2005, he received a call from Assistant District Attorney General Tom Thurman. Mr. Johnson stated that he had met with Mr. Farris and discussed the present case before General Thurman called, and he "instantly knew exactly what [General Thurman] was talking about" when he called. After General Thurman's phone call, Mr. Johnson met with his client again. At this meeting, they discussed "the scenarios of what could go on" and "talked about almost every possibility [they] could think of. . . ." Mr. Farris had several pending charges against him, and they were concerned about him being charged with conspiracy. Mr. Johnson explained the withdrawal defense to Mr. Farris and because of this discussion, Mr. Farris

agreed to talk with the state. Mr. Johnson called General Thurman and arranged a meeting. They met on October 4, 2005 and determined that Mr. Farris would use a tape recorder in his cell to record his conversations with the defendant. According to Mr. Johnson, "[t]here was never any promise of any help . . . nor did [they] ask for any." Mr. Johnson testified that the court reduced Mr. Farris's bond "so it would look like . . . he would be able to make the bond." Mr. Farris was unable to make the bond, and authorities transferred him to the Williamson County Jail.

During cross-examination, Mr. Johnson denied knowledge of Mr. Farris's assistance to police before he began representing him. Mr. Johnson agreed that if a jury convicted him of his pending attempted first degree murder and aggravated robbery charges, Mr. Farris could serve a minimum fifteen-year sentence and a maximum one hundred eighty-year sentence. Mr. Farris also faced a possible eight to thirty-year sentence for a pending aggravated robbery charge. Mr. Johnson stated that, since he began representing him, Mr. Farris had always been in state custody. Mr. Johnson agreed that for Mr. Farris to "get his freedom," he would have to "cut a deal," a jury would have to find him not guilty of his pending charges, or the court would have to sentence him to probation.

To decide whether Mr. Farris could testify about discussions he had with the defendant concerning express kidnappings, the prosecution made an offer of proof outside the presence of the jury. After hearing Mr. Farris's testimony, the court ruled that the discussions between Mr. Farris and the defendant concerning express kidnappings were admissible.

On direct examination, Mr. Farris testified that he was an inmate at the Corrections Corporation of America facility in Nashville, Tennessee after being arrested for several crimes. He stated that authorities moved him to protective custody in the Criminal Justice Center because of enemies he acquired after working with the police department's vice squad. Mr. Farris first met the defendant when the defendant arrived at the Criminal Justice Center. During the defendant's first night in jail, Mr. Farris called the defendant's brother-in-law in Chicago at the defendant's request. Mr. Farris did not have any further contact with the defendant until a couple of weeks later.

According to Mr. Farris, the defendant initiated a conversation with him and asked about prison life. Mr. Farris told the defendant about prison, and the defendant told him about Mexico. Mr. Farris stated that eventually the defendant "started telling [him] about express kidnappings in Mexico." Mr. Farris said that he did not have previous knowledge of what express kidnappings were, and the defendant explained that express kidnappings were when "you grab somebody's child, . . . that has a lotta [sic] money and hold them for ransom." Mr. Farris said that they discussed express kidnappings at least ten times.

Beyond express kidnappings, Mr. Farris said that he and the defendant discussed killing the Levines. Mr. Farris stated that killing the Levines came up after the defendant was "stressing the issue that, if it weren't for the Levines, that he wouldn't be locked up, that they wouldn't have a case against him in court, and . . . the Levines [were] his biggest problem, as far as his case went." Mr. Farris further stated that the defendant thought he was in jail for first degree murder, and it was the defendant's idea to kill the Levines. Mr. Farris testified that he and the defendant discussed killing the Levines for about a month before he spoke to the police. Mr. Farris and the defendant communicated by going to each other's cell doors to talk. They could also talk while they were in their cells, which were next to each other. During the time that Mr. Farris had a cell mate, he and the defendant would go to the roof to talk about the plan to kill the Levines. According to Mr. Farris, he and the defendant talked every day. They also used written notes to communicate. Mr. Farris stated that the defendant also spoke with the inmate on the other side of his cell, and occasionally this other inmate was on the roof while he and the defendant talked. Mr. Farris further stated that if the defendant was not talking to him, he was talking to the other inmate.

Mr. Farris said that he went along with the plan to kill the Levines because the defendant said he would pay his bond. According to Mr. Farris, the defendant said that he could use "a lady in New York" and some property he had in Mexico to get the money to pay the bond. Mr. Farris created a fictitious girlfriend, Danielle, as part of the plan to get the defendant to make his bond. The defendant wrote letters to Danielle that Mr. Farris "was to copy and mail to . . . the girl [he] made up."

Mr. Farris testified that he and the defendant talked about killing the Levines "for about a month" and that he never intended to kill the Levines. Eventually Mr. Farris became concerned about his involvement and told his mother and attorney about the discussions that he was having with the defendant. Mr. Farris was concerned about being charged with the crime and what would happen if he did not follow the plan after the defendant posted his bond. After Mr. Farris talked with his mother and attorney, he met with the police and the district attorney. Mr. Farris said that the district attorney did not promise him anything for giving his statement to authorities. He further said that "it'd be nice" to get consideration for testifying truthfully at the trial; however, he did not know whether it would happen. Before [he spoke] with authorities on October 4, no one had discussed the defendant with Mr. Farris.

After meeting with authorities, Mr. Farris agreed to record his conversations with the defendant. Mr. Farris stated that authorities instructed him to "go along with what was supposed to happen," so he acted like a hit man. At the time Mr. Farris spoke with authorities, the plan was for him to get out of jail on bond, lay low for a while, observe the Levines, and find a routine where he could catch them together. According to Mr. Farris,

> [he] was to kill them—[He] was to make contact with [Colonel March] . . . to get a feel about . . . how he was gonna [sic] act about things.

> [A]fter [he] killed the Levines, [the defendant] wanted [him] to . . . have some chilling-off time[.] [He] didn't want [him] to go to Mexico right then. . . . [A] month or so after, [he] was to go to Mexico and wait on [the defendant].

Mr. Farris further testified that Colonel March was to provide him with a place to stay in Mexico and "show [him] the ropes about being in Mexico, until [the defendant] got there." Mr. Farris stated that the defendant gave him email addresses and a phone number to contact Colonel March.

Per the instructions given to him by the police, Mr. Farris told the defendant that his bond was lowered and that his girlfriend would be posting it. Authorities placed recorders in Mr. Farris's cell, and he recorded a conversation with the defendant on October 6. After the first recording, someone from Internal Affairs at the prison went to Mr. Farris's cell to retrieve the recorder and give him a new one. Mr. Farris recorded additional conversations between him and the defendant on October 7.

After he made the second recording, authorities transferred Mr. Farris to the Williamson County Jail so that it would appear that he was out on bond. While he was there, Mr. Farris further cooperated with police by calling Colonel March. The police gave him a script to follow, and he recorded five conversations with Colonel March over several weeks. Mr. Farris stated that during the last conversation he told Colonel March that he had "done the job and to pick him up at the Guadalajara Airport."

On cross-examination, Mr. Farris admitted that he had been convicted of theft of property more than $1000, theft of property more than $500, facilitation of robbery, reckless endangerment, theft of property more than $10,000, and facilitation of aggravated robbery. He further admitted that he had three counts of criminal attempt to commit first degree murder and two counts of aggravated robbery charges pending against him. Mr. Farris agreed that he worked as a confidential informant for the police in

February 2005.

Mr. Farris recalled the day that the defendant arrived in the cell next to him, which was the only available cell. He testified that he told the defendant that he hated prison and that he did not want to go back to prison. Mr. Farris was facing several years of incarceration if convicted of his pending charges, and he said that was why he hired an attorney. Mr. Farris denied knowing that if he gave information about another person he could receive leniency on his pending charges. He testified that he was expecting leniency after working for the police in 2005, but he did not receive anything for his work. Mr. Farris agreed that this was why he did not trust the police.

Mr. Farris testified that after the defendant arrived at the jail he watched the news and heard about the defendant's case. Mr. Farris denied that creating a crime and bringing the defendant into it was his "ticket to freedom." He agreed that if he got favorable treatment by becoming a state witness, he would be released from jail more quickly and would not have to risk a jury trial. However, Mr. Farris further stated that he did not know if that would happen because he had "never gotten no [sic] deal." He testified that during a conversation with the defendant, he told the defendant that their plan was his only chance for freedom and that he did not plan to get caught. Mr. Farris said that he "was playing a role" when he said this. Mr. Farris also said that he was helping the police for free, and he still did not trust them while he was working for them. Mr. Farris admitted that he said things to make the defendant believe he wanted to kill the Levines, but he denied that he pushed the defendant toward killing them. According to Mr. Farris, the defendant "was just as hyped as [he] was."

Mr. Farris stated that he had been talking to the prosecutor and detectives about this case, and the prosecutor asked him to testify truthfully at the trial. He stated that he "was gonna [sic] do the footwork," and the defendant was going "to set everything up." Mr. Farris told the defendant that he had previously committed a crime like their plan. Mr. Farris denied that he "petted" the defendant into conspiring to kill the Levines. However, Mr. Farris admitted that he told the defendant that he never had a big brother, he never felt real compassion for anyone outside his family, and talking to the defendant put him at ease. He also told the defendant that before he met him he was mad at everyone. He further admitted that he told the defendant that he would kill himself before he let anything go wrong with their plan. Mr. Farris testified that he talked about the defendant's family to try to get close to the defendant. He denied trying to inflame the defendant into killing the Levines and stated that the defendant was already angry with them and "hated them." Mr. Farris said that he "was trying to show [the defendant] . . . that [he] agreed with him, that [he] was on his side, that [he] felt the same way he did about the Levines, which [he did not]." He further stated that he was not going to kill the Levines, and he agreed that he could not have killed them because he was in jail.

Mr. Farris admitted that he told the defendant that they needed to talk about "hard facts" and "get a plan down pat" before he was released on bond. When asked if his statements showed that he and the defendant did not have a plan in place, Mr. Farris answered that one "could probably draw that from it." Mr. Farris testified that he told the defendant that he had money to buy two cars to use during the plan to kill the Levines, but he did not really intend to buy them. Mr. Farris admitted that during the recordings, he concocted multiple ideas and stories to present to the defendant in furtherance of the plan.

Mr. Farris stated that the defendant established rules and parameters for him to follow when he carried out the plan. When Mr. Farris was ready to kill the Levines, he was to call Colonel March in Mexico, using the code name Bobby Givings, and say "I'm ready to buy the BMW." After he received the call, Colonel March was to email the defendant's sister who would then send regular mail to the defendant. When he received the mail, the defendant was to call his sister, who would then email Colonel March. Mr.

Farris was not to kill the Levines until the defendant said it was okay. The alternative plan was that Mr. Farris was not to contact Colonel March or do anything at all until the defendant gave him permission to act. Mr. Farris stated that the defendant "wanted [him] to wait, at least, thirty days because of the videotapes in the jail." He further stated that the defendant told him to delay the killings because "[he] wanted [him] to have some cooling-off time." After he left the jail on October 7, Mr. Farris never spoke with the defendant again.

Mr. Farris stated that in the plans that he and the defendant discussed, Colonel March was to give him a safe place to stay after the killings and would be the channel of communication between him and the defendant. They had several code names to let Colonel March know they had spoken. In addition to Bobby Givings buying a BMW, they also created a scenario with Jesus Roldan and a pottery business. Mr. Farris said that the defendant told him that Colonel March "was the key to this . . . and . . . would help [him], in whatever way he could."

On October 12, after authorities transferred him to the Williamson County Jail, Mr. Farris called Colonel March and asked him if the defendant had contacted him. He also asked Colonel March if he knew about the agreement he had with the defendant, and Colonel March said "No, I'm sorry, I don't know anything." According to Mr. Farris, Colonel March also said that the defendant advised him that Mr. Farris would call and that he was "supposed to listen and talk."

During their conversation, Mr. Farris asked Colonel March to get him a clean gun, and Colonel March told him that he had "a nine." Mr. Farris spoke with Colonel March about how he would carry out the killings and asked him for help. He agreed that the defendant never told him to discuss these things with Colonel March and that Colonel March was only supposed to serve as a communication channel. On October 20, Colonel March told Mr. Farris that he had spoken with the defendant on October 18. Colonel March advised Mr. Farris that he had given the defendant his message and that the defendant was okay with Colonel March and Mr. Farris having contact. Mr. Farris admitted that with the help of authorities, he created several different scenarios that he did not discuss with the defendant and presented them to Colonel March. Mr. Farris stated that as far as he knew, all Colonel March had done was talk to him and the defendant. On October 27, Mr. Farris called Colonel March and told him that he completed the killing. He also told Colonel March on which flight he would arrive in Mexico.

On redirect examination, Mr. Farris testified that he had never testified in court before. He stated that before the taping, the defendant told him how much he hated the Levines on a daily basis. He and the defendant talked about killing the Levines every day before he talked to the police. Mr. Farris explained that when he told the defendant he needed hard facts, he was referring to "exactly where the Levines lived; . . . [and] any information [the defendant] could give [him] like that. . . ." He said that they talked about the defendant having the final say on when he would kill the Levines. Mr. Farris said that he was only to talk to Colonel March when they released him from jail, and he told Colonel March that he was going to kill the Levines. Mr. Farris stated that Colonel March never told him not to kill the Levines. According to Mr. Farris, the defendant told him that Colonel March "had been in the military and that he had weapons." The defendant told Mr. Farris that if he had a clear phone line to talk to Colonel March, then Colonel March would "come up right now and shoot the Levines." The defendant also told him that Colonel March "had . . . four mercenaries ready to come and kill the Levines. . . ."

Mr. Farris recalled that during the recordings, the defendant referenced that they had been talking about the plan for weeks. He also recalled that the defendant told him that he had "been searching and searching and searching for a year for somebody, to have the partner that . . . could watch [his] back and win [sic][.]"

Daron Hall, the Davidson County Sheriff, testified that in October 2005, law enforcement officers requested his help in the investigation of a murder conspiracy. They asked the sheriff's department to move an inmate so that a recording device could be placed in a cell. His department moved the inmate and assigned investigator Kevin Carrell to assist them in placing the recorder in the cell. Sheriff Hall stated that this was the first time his office did anything regarding Mr. Farris. He said that Mr. Farris was incarcerated on April 23, 2005 and moved to protective custody on June 7, 2005. Sheriff Hall testified that Mr. Farris requested to be placed in protective custody because "he was concerned about his safety." Sheriff Hall further testified that on August 12, 2005, the defendant arrived at his facility and was placed in protective custody for "multiple reasons, one of those being a request through [the defendant.]" They placed the defendant in "the [cell] that was available," which was next to Mr. Farris's cell.

On cross-examination, Sheriff Hall testified that inmates were not supposed to cross a red line drawn on the floor in front of the cells. He explained that the purpose of the line was "to prevent contraband from being handed back and forth through inmates and having physical contact with one another." He stated that painting a line on the floor did not always accomplish the policy of preventing contraband and physical contact. On redirect examination he stated that they enforced the policy to the best of their ability, and no one requested that they not enforce the policy as to Mr. Farris and the defendant.

Kevin Carrell, an investigator at the Davidson County Sheriff's Office and a member of the FBI Violent Crimes Task Force, testified that he participated in an undercover investigation of the defendant on October 6, 2005. He assisted in the investigation by having an officer place recorders in Mr. Farris's cell while he and his cell mate were at trial. Mr. Carrell stated that he retrieved the recorder by pretending to conduct an internal affairs investigation. He had Mr. Farris leave the cell, retrieved the tape-recorder from him, and gave him another tape-recorder. The next day, Mr. Carrell retrieved the second tape recorder and turned both recorders over to the police department.

Mr. Carrell testified that they allow the inmates housed in protective custody the same recreation opportunities as inmates in the general prison population. They videotaped the inmates during their recreation time, and they recorded the interactions between Mr. Farris and the defendant. Mr. Carrell stated that the inmate's phone calls are also monitored, but the defendant made unmonitored calls because he was calling outside the country. Mr. Carrell stated that he personally observed the defendant making a call from the counselor's unmonitored phone on which authorities had placed a court ordered wiretap.

On cross-examination, Mr. Carrell testified that he did not have anything to do with placing the defendant in a cell beside Mr. Farris's. When asked if they enforced the policy preventing inmates from crossing the red line in front of the cell as to the defendant and Mr. Farris, Mr. Carrell explained that the policy was "kinda [sic] like the old seatbelt law[;] . . . it was just one of the things that they could tack onto you, in the event of a ticket." He further testified on redirect examination that, to his knowledge, they did not enforce the rule as to anyone, and he had never seen the rule being enforced.

Sergeant Pat Postiglione testified that he was assigned to the Homicide Cold Case Unit of the Metropolitan Nashville Police Department. He was involved in the investigation of the disappearance of Mrs. March. Sergeant Postiglione stated that they charged the defendant with Mrs. March's death in a sealed indictment. He further stated that the first time the public knew of the indictment was when they arrested the defendant on August 12, 2005 in Los Angeles, California. After they arrested the defendant, Sergeant Postiglione received information from the district attorney's office about Mr. Farris. Based on that information, he met with the district attorney's office, Mr. Farris and his counsel, and Metropolitan Nashville Police Department homicide detective Bill Pridemore. Before the investigation of the defendant, Sergeant Postiglione had no contact with Mr. Farris.

Sergeant Postiglione stated that initially Mr. Farris was reluctant to speak with him, but he eventually interviewed Mr. Farris.

After the interview, Sergeant Postiglione corroborated the information Mr. Farris gave him at the interview. Specifically, he corroborated whether Mr. Farris "was in the cell that he described, [and] whether . . . he had made a phone call at [the defendant's] request." Mr. Farris agreed to wear a wire and record his and the defendant's conversations to confirm that what he told the authorities was true. Sergeant Postiglione stated that they instructed Mr. Farris

> that on October the sixth, when he went to court, [he] would come back and tell [the defendant] that his bond had been reduced from three-hundred-thousand dollars to a hundred-and-fifty-thousand dollars, and he would now be able to make bond and proceed with the plan that they had already conspired about.

> And the plan was that he would make his bond through his girlfriend, on October the seventh, the following day.

Sergeant Postiglione further stated that they instructed Mr. Farris to "continue to play the role of the hit man . . . to see how far it went." Mr. Farris recorded his conversations with the defendant, and when the recordings were finished, they returned them to Sergeant Postiglione. After Sergeant Postiglione received the recordings, his office downloaded them and immediately made them into disks to preserve them. Sergeant Postiglione identified the recordings, and the state played them for the jury.

Sergeant Postiglione testified that they took Mr. Farris to the Williamson County Jail after the second recording. He stated that if anyone looked into Mr. Farris, his records would show that he was out on bond rather than transferred to the Williamson County Jail. Mr. Farris continued to assist authorities by making "controlled telephone calls to Mexico" to contact Colonel March and see if he was going to continue with the conspiracy. Mr. Farris made five phone calls to Colonel March. Sergeant Postiglione said that they "were concerned about possible leaks inside the jail," so they moved the time line quicker than the original thirty days. Based on some conversations about weapons that had occurred, Sergeant Postiglione's office wanted to see if Colonel March would commit an overt act by bringing a weapon from Mexico to the United States. They also attempted to have Colonel March wire money to Mr. Farris, but Mr. March was not able to make the wire until November 1, and Sergeant Postiglione's office did not want to wait that long. The third scenario to see if Colonel March would commit an overt act was to have Mr. Farris "fly into the Guadalajara through the airport and be picked up by [Colonel] March, in an attempt to see if [Colonel] March would actually leave his residence and go to the airport to pick up Mr. Farris, believing that he'd just committed two homicides." Sergeant Postiglione testified that he personally observed and recorded the phone calls. Sergeant Postiglione identified the recordings of the conversations between Mr. Farris and Colonel March, and the state played the recordings for the jury.

On October 17, Sergeant Postiglione requested that the counselor's phone inside the jail be wiretapped, and the wiretap was set up on October 21. Sergeant Postiglione asked the FBI in Mexico "[t]o conduct surveillance on [Colonel] March and note his movements, while the phone calls [were] being made." Sergeant Postiglione served an arrest capias on [Colonel] March and the defendant. At the time of his arrest, the defendant asked Sergeant Postiglione "if there was [sic] any co-conspirators" and never asked who he had conspired to kill.

On cross-examination, Sergeant Postiglione testified that when he first received the information from Mr. Farris, he "[a]bsolutely" questioned whether he was being truthful. Sergeant Postiglione said that he was unaware of any discussions about Mr. Farris receiving favorable treatment for providing information. He agreed that he was present

when Mr. Farris met with the federal government and that Mr. Farris was hoping for leniency if he gave truthful, verifiable information. Sergeant Postiglione stated that the police department's investigation determines whether the information is truthful. He further stated that before October 6, the only information they had was Mr. Farris's statements.

Sergeant Postiglione stated that the first time authorities knew about Mr. Farris receiving the Levine's address was on October 6[;] however, he further stated that he could not "say for certain that he didn't get an address prior to that day." When asked whether there was any indication that the defendant gave Mr. Farris the "green light" to kill the Levines, Sergeant Postiglione said that it was "a matter of interpretation[,]" and his "answer would probably be yes. . . ." Sergeant Postiglione stated that the defendant was not on any of the tapes between Mr. Farris and Colonel March, but they referenced him several times. He agreed that in a transcript of a recording between Colonel March and Mr. Farris, Colonel March stated that he did not know "the specifics of the agreement," he just knew that when "Bobby Givings" called, he was to talk to him. Sergeant Postiglione testified that when Colonel March said that he did not want to know what was going on, "his impression was that he didn't want the details, for very obvious reasons." He further testified that he did not have a tape where the defendant says, "Go kill them[,]" but he did have a recording where Mr. Farris advised the defendant that "[i]t may go down next week" and the defendant did not say, "No, don't do it." Sergeant Postiglione said that his unit also recorded a conversation where the defendant's sister acknowledged an email to the defendant, and the defendant told her, "On second thought don't send me that e-mail of Bobby Givings." He admitted that no specific language was telling Mr. Farris to go forward with the killings, but he stated that "there was a big push on codes and code words and a very covert operation."

On redirect examination, Sergeant Postiglione testified that "Mr. Farris was concerned about being charged with the actual conspiracy or solicitation with [the defendant]." He stated that in the October 20 conversation, when Mr. Farris asked whether Colonel March gave the defendant his message, the message was "that he was looking for the car, looking to buy the car, was looking to purchase a BMW, whatever language they agreed on." On recross-examination, he agreed that when Mr. Farris asked about the message, Colonel March's actual answer was "That I had talked to you? Yes."

At the close of Sergeant Postiglione's testimony, defense counsel asked the court to declare a mistrial arguing that when the court did not allow them to question the witness about things in the transcript, the court prevented him from using the witness to present the defense's theory of the case. The court denied the request for a mistrial, and the state recalled Kevin Carrell as a witness.

Using a diagram of the jail that he had made, Mr. Carrell pointed out the defendant's cell. He said that the defendant was in cell number eight, and Mr. Farris was in cell number nine. Mr. Carrell stated that they made a surveillance video while they recorded the conversations on October 6. He explained that "the [camera was] in the Special Management Unit on the fourth floor of the Criminal Justice Center. There are cameras mounted at the rear of each of these two quads, and the field of view of the camera is basically to cover the majority of the quad." The state played the surveillance video for the jury.

On cross-examination, Mr. Carrell testified that only the lower right-hand quadrant of the video was pertinent to the placement of Mr. Farris and the defendant. He stated that during recreation time they allow the inmates to "walk around within the quad that they're assigned to . . . for approximately an hour a day." He further stated that the inmates can make phone calls, bathe, and participate in outdoor activities during this time.

Reno Martin testified that he entered a guilty plea to a federal drug charge and was an inmate at a county facility in Bowling Green, Kentucky. He said that he was serving a "nine-year sentence, with a downward departure." He would be eligible for a reduction in his sentence if he cooperated with authorities in his case and other cases. Mr. Martin stated that before he was arrested, he had been a police officer for the City of Cookeville for fifteen years. Mr. Martin testified that because of his drug charges he was incarcerated in protective custody at the Davidson County Criminal Justice Center. He stated that the defendant and Mr. Farris were in the Protective Custody Unit when he arrived in August. He further stated that Mr. Farris's cell was the first one in the unit, and it was next to the defendant's cell. Mr. Martin's cell was three cells down from the defendant's. According to Mr. Martin, they eventually moved him to Mr. Farris's cell on the left side of the defendant, and they moved Mr. Farris to the cell on the right side of the defendant. Mr. Martin stated that he spoke to the defendant and called the defendant's attorney for him.

On October 14, 2005, Mr. Martin made a proffer of information to authorities in hopes of receiving consideration from the federal and state governments. He stated that he told authorities that he thought there was "some type of plan that the Levines were gonna [sic] be injured or harmed." Mr. Martin further stated that he "noticed a lotta [sic] communication between [the defendant] and [Mr. Farris], a lotta [sic] secret talking." He said that he was suspicious the day that Mr. Farris was supposed to get out on bond because the defendant asked to switch recreation time with him so that he could make an important call to his attorney. Mr. Martin said that after the defendant made the call "he paced up and down the hallway a few times and kept going over to the television, attempting to turn it on." According to Mr. Martin, once the television came on, the defendant went to Mr. Farris's door immediately, and they started talking. Mr. Martin heard the defendant tell Mr. Farris "that everything was set, . . . not to discuss it anymore, and 'We're not gonna [sic] talk about nothing' or 'not even gonna [sic] talk with each other anymore.'"

Mr. Martin testified that he overheard phone calls that the defendant made. He stated that during the first call, the defendant was "pretty upset with whoever he was talking to, about money not being transferred yet. . . ." He said that the defendant told the person on the other end that he would call someone else to ensure that the money got there. The defendant made a second call, which Mr. Martin also overheard. Mr. Martin testified that during the second phone call, the person with whom the defendant was speaking "advised him about the money[,]" and the defendant gave that person an account number.

Mr. Martin stated that he and the defendant discussed the custody battle between the defendant and the Levines. Mr. Martin testified that the defendant was "pretty upset at the Levines" and said that "it was good that he wasn't out and had a gun." According to Mr. Martin, the defendant also said that "it shoulda [sic] been them that he'd taken care of. . . ." Mr. Martin also had a conversation with the defendant about Mr. Farris showing up for his second court appearance. The defendant told Mr. Martin that "he thought [Mr. Farris] would show up for the first appearance, but he didn't think he'd ever show up for the second appearance." After discussing Mr. Farris being out on bond with his wife, Mr. Martin told the defendant that they thought Mr. Farris was "a plant by the FBI." Mr. Martin said that after he told the defendant that, the defendant was "very concerned, lost all expression in his face, went pale, [and] began pacing up and down the hallway." Mr. Martin stated that after the defendant was arrested on a conspiracy charge, he asked that Mr. Martin tell his attorney that he never saw the defendant and Mr. Farris talking or interacting with one another.

Michelle Knight, an investigator with the Davidson County Sheriff's Office, testified that an automated system in the jail recorded the inmates' outgoing calls. The system

automatically recorded inmate telephone calls, except privileged communications. Ms. Knight had a copy of a phone call made by the defendant to Kathy Breitowich, which the state played for the jury. Ms. Knight stated that a recording at the beginning of the call, which the defendant would have heard, advised him that the system may monitor the call. She said that they did not monitor the outgoing mail in the jail; however, she received a subpoena on November 10, 2005, that required the sheriff's department to monitor the defendant's outgoing mail.

Fletcher Long testified that Colonel March hired him as his attorney for federal and state conspiracy charges. The defendant was Colonel March's co-defendant for the state conspiracy charges. He stated that on February 1, 2006, he and Colonel March were discussing the cases at the Criminal Justice Center, and the defendant entered the room where they were talking. Mr. Long further stated that defendant said to Colonel March, "Dad, I'm not gonna [sic] roll on you; you don't roll on me. We will wear these jumpsuits as a badge of honor, a badge of honor."

Phillip Taylor testified that he was a Metro Police Officer in the Drug Task Force before becoming employed with the Twentieth Judicial District Drug Task Force at the District Attorney's Office. During his time as a Metro Police Officer, he assisted in the investigation of a conspiracy to commit murder charge that involved the defendant and Colonel March. Mr. Taylor conducted a wiretap of a phone used by the defendant in the counselor's office at the Sheriff's Department. Mr. Taylor said that they first recorded the defendant when he called his wife, Carmen, on October 21, 2005. During this phone call, the defendant also spoke with Colonel March. Mr. Taylor identified a copy of the wiretap cassette he recorded on October 21, and the state played the copy for the jury.

Kenneth John Sena, a Supervisory Special Agent with the FBI, testified that he was assigned to the Guadalajara Regional Office in Guadalajara, Jalisco, Mexico. He stated that he received a request for his assistance in the investigation of a conspiracy to commit murder that involved Colonel March. Through his investigation, Agent Sena learned that Colonel March was living in San Antonio, Tlaquepaque, Jalisco, Mexico. Agent Sena confirmed Colonel March's phone number with Sergeant Postiglione and placed him under surveillance at Sergeant Postiglione's request. On October 27, 2005, while under surveillance, Colonel March left his home and drove to the Guadalajara International Airport. Agent Sena and two Mexican immigration officials confronted Colonel March when he arrived at the airport and asked to speak with him. When asked why he was in Mexico, Colonel March said that "he was there to pick up a gentleman by the name of Bobby Givings." Agent Sena testified that Colonel March said that Bobby Givings was "a friend of a friend" that he had never met. According to Agent Sena, Colonel March was "evasive" when he asked him about the friend of a friend. Agent Sena described Colonel March as appearing "shaken" and "pale" when he approached him and told him who he was. Agent Sena stated that they never detained or arrested Colonel March and that he fully consented to the interview.

On cross-examination, Agent Sena stated that he never spoke with the Levines while he was surveilling Colonel March. Agent Sena said that he accompanied the defendant to Los Angeles and handed him over to U.S. Customs and the FBI.

At the close of the state's proof, the defendant made a motion for judgment of acquittal, which the trial court denied. The defendant waived his right to testify, and the defense presented questions and answers from Colonel March's deposition through a disinterested witness.

Colonel Arthur March testified that he "never in [his] life" called Nathaniel Farris a/k/a Bobby Givings; however, Mr. Farris called Colonel March "all the time." He stated that he had never heard of Mr. Givings before the defendant told him that Mr. Givings was a friend that needed help. He further stated that the defendant did not tell him what type of

help Mr. Givings needed. When he called, Mr. Farris used Colonel March's dog's name, his mother's maiden name, and other code words to notify Colonel March that he had spoken with the defendant. Colonel March stated that he was unaware that Mr. Farris was calling him to elicit help in killing the Levines. He said the Levines "were always in danger," but he did not know of any agreement between the defendant and Mr. Farris when Mr. Farris first called him. He also said that before speaking with Mr. Farris, he did not have an agreement with the defendant to harm the Levines. According to Colonel March, it was his idea to hurt the Levines before this case happened, and "[the defendant] never mentioned harming the Levines." Colonel March had not followed up on his idea to harm the Levines, and he stated that "[Bobby] Givings" suggested that he take action against them. When Mr. Farris called he would talk about instruments and surveillance. Colonel March said that Mr. Farris told him "not to talk to [the defendant] about Mr. Givings" and "not to . . . let anybody know." Also, Colonel March was to send any communication to Ms. Breitowich. Colonel March said that he never talked to the defendant about what Mr. Farris said to him, and he only told the defendant that "he had made contact." He stated that when Mr. Farris would go into detail about killing the Levines, he told him that he "didn't want to know anything about it." According to Colonel March, he did not know that Mr. Farris a/k/a Bobby Givings was talking about killing the Levines until the "second or third phone call, maybe the first."

On cross-examination, Colonel March testified that he pled guilty for his involvement in the conspiracy to kill the Levines. He could not remember whether he and the defendant had used code names to communicate before the defendant told him Bobby Givings would be calling. Colonel March said that the defendant told him not to talk on the phone or write anything about Bobby Givings. Colonel March recalled a conversation where he told the defendant that "it was gonna [sic] happen next week." When Colonel March was asked if there was any question that he intended for the Levines to be killed and hoped they would be killed, he answered, "Sure, several times."

*March v. State*, 2010 WL 2219419, at *1–*16 (footnote omitted; most alterations in original).

## III.    STANDARD OF REVIEW

### A.    Standard of Review of Unexhausted and Defaulted Claims

Generally, a federal district court will not entertain a petition for writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine which promotes comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Id.*; *see also Duncan v. Henry*, 513 U.S. 364, 370 n.1 (1995) (noting that the "purpose of this 'fair presentation' requirement is to 'provide the state courts with a "fair opportunity"' to apply controlling legal principles to the facts bearing upon his constitutional claim.'" (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982)). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the

same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (citations omitted). Once a petitioner's federal claims have been raised in the highest state court available, the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990). In Tennessee, raising an issue on direct appeal to the Tennessee Court of Criminal Appeals satisfies the exhaustion requirement as to that issue. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); Tenn. S. Ct. R. 39.

A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal habeas review. *Caver v. Straub*, 349 F.3d 340, 345 (6th Cir. 2003) (citation omitted). If a habeas petitioner retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose v. Lundy*, 455 U.S. 509, 518, 520-22 (1982)); *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")).

However, if an unexhausted claim would be procedurally barred under state law, for instance by a state statute of limitation or state rule barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted. *Goldberg v. Maloney*, 692 F.3d 534, 538 n.3 (citing *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002)). In order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (quoting *Harris v. Reed*, 489 U.S. 255, 262 (1989), and citing *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982)).

The "cause" standard requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Haliym v. Mitchell*, 492 F.3d 680, 690–91 (6th Cir. 2007) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). This standard may be satisfied, for instance, by a showing of interference by officials that made compliance with the

procedural rule impracticable, or attorney error rising to the level of ineffective assistance of counsel, or a factual or legal basis for a claim that was not reasonably available to counsel. *McCleskey v. Zant*, 499 U.S. 467, 493–94 (1991) (citations omitted). To demonstrate prejudice, "[t]he habeas petitioner must show not merely that the errors at trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Murray*, 477 U.S. at 494 (emphasis in original) (alterations, citation, and internal quotation marks omitted). Finally, to show that failure to consider the merits of a procedurally defaulted claim would result in a "fundamental miscarriage of justice," a petitioner must be able to show that "a constitutional violation has probably resulted in the conviction of a factually innocent person." *Pudelski v. Wilson*, 576 F.3d 595, 606 n.2 (6th Cir. 2009) (citations omitted). This exception, naturally, applies only in very rare circumstances.

### B. Standard of Review of Fully Exhausted Federal Claims

Even when a petitioner's application for a writ of habeas corpus raises a federal constitutional claim that has been properly exhausted in the state courts, this Court's review of the state court's resolution of the issue is quite limited. The standard for reviewing applications for the writ of habeas corpus is set forth in 28 U.S.C. § 2254(d). This section states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.*

A state court's decision is "contrary to . . . clearly established federal law" if "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts." *Lundgren v. Mitchell*, 440 F.3d 754, 762–63 (6th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)) (internal quotation marks and alterations omitted). "A state court decision is an 'unreasonable application' of clearly established federal law 'if the state court identifies the correct governing legal principle but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* at 763 (quoting

*Williams*, 529 U.S. at 413). Clearly established federal law is determined by the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Id.* (citations omitted)

The Supreme Court has stressed that AEDPA's standard is "difficult to meet," "highly deferential," and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, --- U.S. ----, 131 S. Ct. 1388, 1398 (2011) (citations omitted). "AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Schriro v. Landrigan*, 550 U.S. 465, 473–74 (2007) (quoting 28 U.S.C. § 2254(e)(1)). In reviewing whether a state court decision involved an unreasonable application of federal law, a district court must remain mindful that "an unreasonable application of federal law is different from an incorrect [one]," *Williams*, 529 U.S. at 410, and must decline to award habeas relief where "'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, --- U.S. ----, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Further, the Supreme Court has repeatedly affirmed that, when a federal claim was presented to the state court, and the state court denied relief without explicitly addressing the federal claim or explaining its reasons, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Johnson v. Williams*, --- U.S. ----, 133 S. Ct. 1088, 1094 (2013) (quoting *Richter*, 131 S. Ct. at 784–85). Under such circumstances, the reviewing court must apply AEDPA's deferential standard of review. A state court need not even be aware of the applicable precedent, so long as neither the reasoning nor the result of the state-court decision contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002), *cited in Richter*, 131 S. Ct. at 784.

With these principles in mind, the Court will proceed to consider March's claims.

## IV. ANALYSIS AND DISCUSSION

### A. Ground One: That a fatal variance between the proof adduced at trial and the allegations in the indictment violated the petitioner's constitutional rights

March contends that a "fatal variance" existed between the proof adduced at trial and the allegations made in Count One of his indictment, in violation of his right to due process. (ECF No. 2, at 12.) The claim, as argued now and in March's direct appeal, actually incorporates two distinct issues: (1) whether the indictment was adequate to inform the petitioner of the charges against him; and (2) whether

the evidence was sufficient to support the conspiracy conviction. The respondent concedes that March raised both parts of this claim as a federal constitutional issue on direct appeal. Because the state appellate court rejected the claim, the issue before this Court is simply whether the state court's decision was contrary to or an unreasonable application of clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence.

In his appellate brief to the Tennessee Court of Criminal Appeals, March (through counsel) summarized the issue thus:

> Whether the proof adduced at trial as to the alleged conspiracy constitutes a fatal variance where the indictment alleges that the Defendant and his Codefendant "did **knowingly** agree *with another* that one or more of them would engage in conduct that constitutes the offense of **First Degree Murder**, . . . (boldface in original; italics and underscore added) and the proof at trial showed, at most, that the named defendants each ostensibly "agreed" with a "cooperating individual" or informant, who merely feigned agreement with each of the named defendants.

(ECF No. 47-1, at 13, Appellant's Br. 1.) More specifically, March argued that the indictment did not accuse March and his father, Arthur March, of conspiring with each other but with "another," Russell Nathaniel Farris, who turned out to be a government informant. March argued that, under state law, to sustain a conviction for conspiracy, the state must prove that two or more people conspired with each other and agreed that one or more of them would engage in conduct that constitutes the offense, *i.e.*, the actual murder. (ECF No. 47-1, at 48, Appellant's Br. 36.) March further argued that

> proof of the facts as found and alleged by the grand jury in Count One would require that Perry March and Arthur March each **in fact** agreed with some third person who himself agreed to act to further or promote or facilitate the actual accomplishment of the murder(s) **and** specifically intended that fatal result. . . . [Instead, t]he proof shows at most that the named Defendants reached an ostensible or illusory understanding with Russell Nathanial Farris that Mr. Farris (who was not a conspirator and who, while acting as a government stooge, could not be a conspirator) would commit murder.

(*Id.* at 49–50, Appellant's Br. 38–39.)

In considering both whether a "fatal variance" occurred and whether the evidence showed that Perry and Arthur March conspired directly with each other, the Tennessee Court of Criminal Appeals stated as follows:

> The record shows that no fatal variance existed between the indictment and the proof at trial. Here, the indictment recited the statutory language and listed the relevant code section, which sufficiently informed the defendant of the charges against him. The state was required to prove that the defendant conspired with another that one of them would commit a murder. The evidence at trial showed that the defendant and Colonel

March conspired to have a third person kill the Levines. The substance of the crime of conspiracy to commit first degree murder was the agreement between the defendants that someone would intentionally kill the Levines. The identity of the killer was not an element of the offense that the state had to prove. Testimony showed that both men committed overt acts in furtherance of the conspiracy. While the evidence at trial showed that the defendant conspired with Colonel March to have Mr. Farris kill the Levines and the indictment alleges that either the defendant or Colonel March would do the killing, this variance is neither material nor prejudicial. *See generally State v. Mayes*, 854 S.W.2d 638, 641 (Tenn. 1993) (holding that where the indictment specifies the purchaser of illegal narcotics but the proof reveals that the defendant actually sold them to another person, the variance is not material and does not prejudice the defendant's substantial rights.) The indictment sufficiently informed the defendant of the charges against him so that he could prepare his defense and not be misled or surprised at trial, and the variance did not present a danger that the defendant may be prosecuted a second time for the same offense. Accordingly, we conclude that the defendant is without relief for this issue.

*State v. March*, 2010 WL 221419, at *18.

March continues to argue in this Court that his conviction was based on facts different from those alleged in the indictment and therefore violated his right to a fair trial and due process of law, as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. The question before this Court, of course, is whether the state court's resolution of the issue resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. 28 U.S.C. § 2254(d).

The Fifth Amendment's requirement of "a presentment or indictment of a Grand Jury" has not been applied to the states, and the Supreme Court has held that due process does not require an indictment in the context of state prosecutions. *McDonald v. City of Chicago*, --- U.S. ----, 130 S. Ct. 3020, 3031 (2010) (citing *Hurtado v. California*, 110 U.S. 516 (1884)); *see also Combs v. Tennessee*, 530 F.2d 695, 699 (1976) ("The Constitution does not require . . . any indictment at all."). Notwithstanding, under federal law, "no man, however bad his behavior, may be convicted of a crime of which he was not charged, proven and found guilty in accordance with due process." *Combs*, 530 F.2d at 698 (quoting *Parr v. United States*, 363 U.S. 370, 394 (1960)). This does not mean, however, that a "variance" between an indictment and the proof presented at trial is a *per se* violation of due process. Rather, the question is "whether there has been such a variance as to 'affect the substantial rights' of the accused." *Berger v. United States*, 295 U.S. 78, 82 (1935).

The substantial rights that might be affected by a variance include (1) a defendant's right to "be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial"; and (2) the right to "be protected against another prosecution for the same offense." *Id.* (citations omitted); *see Combs*, 530 F.2d at 698 (recognizing a state defendant's due-process right to be informed of the nature of the accusations against him with sufficient "definiteness and certainty" as to enable him to prepare for trial). In this case, although the state appellate court did not cite to or rely upon federal standards, its decision was not contrary to or an unreasonable application of clearly established federal law. The state court found, not unreasonably, both that the indictment adequately informed the defendant of the charges against him, and that the indictment protected him from the danger of being prosecuted a second time for the same offense.

With regard to March's sufficiency-of-the evidence argument, the state court further concluded that the "substance of the crime of conspiracy to commit first degree murder was the agreement between the defendants that *someone* would intentionally kill the Levines." *March*, 2010 WL 221419, at *18 (emphasis added). The court also found that the evidence supported a conclusion that both Perry and Arthur March intended the murder of the Levines, regardless of whether either of them actually planned to pull the proverbial trigger. This decision was not unreasonable in light of the evidence presented to the jury, although the evidence was admittedly thin. Nonetheless, there was evidence in the record that reasonably permitted the jury to find that Perry and Arthur March conspired with each other to effect the murder of the Levines. The proof presented at trial showed that father and son were very cagy about speaking directly with each other about the purpose of the conspiracy, because they were aware that Perry's conversations with Arthur were likely to be recorded. Likewise, they very carefully refrained from sending incriminating emails to each other, likely because they were aware that Perry's communications were monitored. Arthur March testified that, at some point, Perry March "told him not to talk on the phone or write anything about Bobby Givings [Farris]." *Id.* at *6. The evidence nonetheless established that Perry told Arthur to talk to Farris, and Arthur later confirmed that he was talking with Farris. Arthur March also recalled a conversation where he told the defendant that "it was gonna [sic] happen next week." *Id.* At another point, the two discussed whether the event had already happened, and when it would appear in the news. At trial, Arthur March made it clear that he intended and hoped for the Levines to be killed. *Cf.*

*United States v. Pennell*, 737 F.2d 521 (6th Cir. 1984) (holding that an agreement with a government agent cannot constitute an unlawful conspiracy, but affirming a conviction for conspiracy to possess with intent to distribute cocaine, where only one defendant was accused of the conspiracy; the defendant attempted to buy two pounds of sham cocaine from government agents who were posing as narcotics suppliers; and evidence showed that the defendant made comments both before and after the sham buy that showed that he was part of a drug distribution chain and that he was in an agreement with at least one other person to possess with intent to distribute the (sham) cocaine).

Because March has failed to demonstrate that the state court's adjudication of his claim involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence before the state court, he is not entitled to relief on the basis of this claim.

**B.** **Ground Two: That the jury instructions allowed the jury to convict the petitioner of conspiracy to commit first-degree murder based on an agreement with a government agent**

Ground Two of the petition asserts that the jury instructions in the underlying criminal case, "taken as a whole, allowed the jury to convict petitioner of conspiracy based upon an agreement with a government agent, in violation of due process principles established under the United States Constitution." (ECF No. 2, at 5.) More specifically, March alleges that

> [t]he Trial Court's instructions to the jury as to "criminal liability for the conduct of another," a legally improper theory of vicarious liability, as well as other portions of the charging instructions, wrongly allowed the jury to impute the conduct and statements of a police agent to Petitioner for purposes of the conspiracy allegations, thoroughly infecting the entire trial, and violating the Petitioner's right to a fair trial and to due process of law, as guaranteed by the 5th, 6th, and 14th Amendments to the U.S. Constitution[.]

(*Id.*) The State argues that this claim for relief is barred by procedural default, because it was never fairly presented in the state courts as a matter of federal constitutional law. It appears that the State is correct.

During a discussion of the proposed jury instructions, the trial judge specifically stated that he believed that it would likely confuse the jury to give the pattern jury instruction on criminal responsibility, "and maybe lessen, from their perspective, the understanding about what's required for criminal conspiracy to be shown." (ECF No. 46-5, at 716, Trial Tr. 1884.) He specifically stated that he would not include that instruction. He nonetheless did include that instruction in the course of instructing the jury as to the elements of the crime of first-degree murder, as follows:

For you to find the Defendant guilty of criminal conspiracy, the State must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the Defendant entered into an agreement with one or more people to commit the offense of First-Degree Murder. It is not necessary that the object of the agreement be attained; and

(2) that each of the parties to the conspiracy had the intent to commit the offense of First-Degree Murder. The State is alleging the parties involved in this conspiracy are Arthur March and Perry March; and

(3) that each party, acting for the purpose of promoting or facilitating the commission of the offense of First-Degree Murder, agreed that one or more of them would engage in conduct which constitutes the offense of First-Degree Murder; and

(4) that one of the parties to the conspiracy committed an overt act in furtherance of the conspiracy. An overt act is an act done by one of the parties, to carry out the intent of the conspiracy; and it must be a step toward the execution of the conspiracy.

. . . .

The essential elements of First-Degree Murder are set out as follows:

(1) that the Defendant, or someone the Defendant is criminally responsible for, unlawfully killed the alleged victim; and

(2) that the Defendant acted intentionally. A person acts intentionally, when it is the person's conscious objective or desire to cause the death of the alleged victim; and

(3) that the killing was premeditated.

. . . .

As to the essential elements of First-Degree Murder, *criminal responsibility for conduct of another is defined as "the defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist in the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant or defendants solicit or solicits, direct or directs, aid or aids, or attempts to aid another person to commit the offense.*

(ECF No. 46-5, at 874–75, 878, 879, Trial Tr. 2025–26, 2029, 2030 (emphasis added).)

Defense counsel did not object to that portion of the instructions after they were given, but he did raise the issue in his written Motion for Judgment of Acquittal or, in the Alternative, for New Trial, arguing that "[t]he Court erroneously instructed the jury as to criminal liability for the conduct of another. The instruction given allowed the jury to impute the conduct of the government stooge Nathaniel Farris to the Defendant for purposes of the conspiracy allegations." (ECF No. 44-2, at 53.) In his brief to the trial court, March did not frame this issue in terms of a constitutional violation, except to argue that the cumulative

effect of various trial errors deprived him of a right to a fair trial. In other words, the record is clear that March did not frame this issue in terms of a federal constitutional violation in his arguments to the trial court.

In his appellate brief to the Tennessee Court of Criminal Appeals, March argued that the jury instructions "as to criminal liability for the conduct of another wrongly allowed the jury to impute the conduct of . . . Nathaniel Farris [to March] for purposes of the conspiracy allegations." (ECF No. 47-1, at 101, Appellant's Br. 89). Again, however, March argued only that the instructions given to the jury were inconsistent with Tennessee law and that they "misled the jury and prejudiced the Defendant." (*Id.* at 108, Appellant's Br. 94.)

In the preceding section of his appellate brief, however, addressed to the "trial court's failure to fully instruct the jury as to the *mens reas* [sic] applicable to the discrete elements of the offense of conspiracy to commit a homicide" (*Id.* at 95, Appellant's Br. 83), March indeed argued that "[t]he Fifth and Sixth Amendments to the United States Constitution 'require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" (*Id.* at 100, Appellant's Br. 88 (quoting *State v. Ducker*, 27 S.W.3d 889, 898–99 (Tenn. 2000), and *United States v. Gaudin*, 515 U.S. 506, 509 (1995)).) Likewise, in the discussion of another issue concerning jury instructions, March argued on appeal that, "[u]nder the United States and Tennessee Constitutions, a defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." (*Id.* at 110, Appellant's Br. 96 (quoting *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)).) The fact that March raised specific constitutional arguments in support of his other claims for relief before the Tennessee Court of Criminal Appeals renders all the more glaring the fact that he did not frame his issue regarding the conspiracy jury instruction in terms of a federal constitutional violation. *Cf. Duncan v. Henry*, 513 U.S. 364, 366 (1995) (observing that the petitioner's failure to "apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment [was] especially pronounced in that respondent did specifically raise a due process objection before the state court based on a different claim").

March filed a motion to expand the record before this Court to include the audio file of oral

arguments made before the Tennessee Court of Criminal Appeals. By separately entered order, this Court has denied that motion on the basis that, even if the Court assumes that March's counsel, in oral argument before the Tennessee Court of Criminal Appeals, argued that the particular error asserted in this claim for relief violated March's constitutional right to a fair trial, raising an issue on oral argument alone does not satisfy the exhaustion requirement. March never framed the issue in constitutional terms in the trial court during or after trial, in his motion for judgment of acquittal, in his brief to the Tennessee Court of Criminal Appeals, or in any post-hearing notice of supplemental authority.[3] The fact that he might have raised this issue in passing during oral argument, but without including it in a written brief or in a post-hearing notice of supplemental authority, was not sufficient to provide the state court with a full and fair opportunity to rule on the claim, and therefore did not exhaust the issue for purposes of federal habeas review. *See Black v. Ashley*, 87 F.3d 1315 (Table), 1996 WL 266521, at *1 (6th Cir. May 17, 1996) ("The fair presentation requirement is not satisfied when a claim is presented in state court in a procedurally inappropriate manner that renders consideration of the merits unlikely."), *quoted in Woods v. Booker*, 450 F. App'x 480, 489 (6th Cir. 2011).

In sum, the Court finds that March has not satisfied his burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to this claim. Further, it is clear that this unexhausted claim would now be procedurally barred under state law, because the petitioner failed to present the claim for determination on direct appeal when he had the opportunity to do so. Rule 4(a), Tenn. R. Crim. P; Tenn. Code Ann. § 40-30-106(g). Accordingly, the claim is deemed exhausted (because no further state review is available) but procedurally defaulted, and may not be considered by the federal court on habeas review unless the petitioner demonstrates both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that

---

[3] March also did not frame the issue in terms of a federal constitutional violation in his application for permission to appeal to the Tennessee Supreme Court. As noted in the discussion of the standard of review of defaulted claims, above, under Tennessee law, a claim is deemed fully exhausted if the issue is presented to the Tennessee Court of Criminal Appeals. A petitioner's failure to include a particular issue in his application for permission to appeal to the Tennessee Supreme Court therefore has no bearing on whether the issue has been fully exhausted for purposes of federal habeas review. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); Tenn. S. Ct. R. 39. However, the fact that March's application for permission to appeal reiterated virtually every other issue presented to the Tennessee Court of Criminal Appeals, but did not frame the "criminal liability for the conduct of another" instruction in federal constitutional terms, further substantiates a conclusion that March did not fully and fairly present the issue in the Tennessee Court of Criminal Appeals for exhaustion purposes.

failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (quoting *Harris v. Reed*, 489 U.S. 255, 262 (1989), and citing *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982)). The latter exception is "reserved for extraordinary cases in which a petitioner can show that a constitutional violation has probably resulted in the conviction of a factually innocent person." *Pudelski v. Wilson*, 576 F.3d 595, 606 n.2 (6th Cir. 2009). March has not shown cause or actual prejudice, nor has he argued that he is factually innocent. The Court therefore finds that the issue is procedurally defaulted and thus barred from review.

Notwithstanding, the Court also finds, in the alternative, that March would not be entitled to relief on this issue even if it were properly before the Court. In its review of March's claim of error related specifically to the criminal-responsibility jury instruction, the Tennessee Court of Criminal Appeals in fact acknowledged the defendant's federal constitutional right to a jury trial and to a "correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *March*, 2010 WL 2219419, at *28 (citation omitted). Ultimately, the court held that the criminal-responsibility instruction given by the trial court did not violate that standard insofar as it constituted a "clear, complete, and correct statement of the law" and "did not mislead the jury." *Id.* In other words, the court implicitly found that the jury instruction as given complied with Tennessee law and did not violate March's constitutional rights.

Although the jury instructions may not have been a model of clarity and might well have served to confuse the jury,[4] the state court's contrary determination rested largely on questions of state law defining the elements of the offenses with which March was charged, which this Court is not in a position to second-guess. The state court's conclusion that the jury instructions did not violate the petitioner's right to

---

[4] For instance, as March points out in his habeas petition, besides being instructed on the offense of conspiracy to commit first-degree murder, the jury was also instructed as to the elements of the lesser included offenses of conspiracy to commit second-degree murder and conspiracy to commit voluntary manslaughter. Second-degree murder was defined for the jury as a murder committed knowingly or intentionally, but not with premeditation (ECF No. 46-5, at 883–84, Trial Tr. 2034–35), and voluntary manslaughter as a killing that results from a "state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner" (*Id.* at 884, Trial Tr. 2035). Although the very act of conspiring necessarily requires premeditation, rendering the instructions for conspiracy to commit second-degree murder or manslaughter completely superfluous and nonsensical, March's attorney affirmatively rejected the trial judge's and prosecutor's suggestion that these instructions might not be applicable (*Id.* at 682–92, Trial Tr. 1850–60), perhaps hoping the jury would conclude that March entered the conspiracy itself in a "state of passion produced by adequate provocation" to lead him to act irrationally. March clearly waived any objection based on this issue.

a clear, complete and correct statement of the law did not involve an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1).

Insofar as March may be attempting to argue that the state court's decision affirming his conviction was "based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding," 28 U.S.C. § 2254(d)(2), this issue is also without merit. In this regard, March argues that his "entire defense was that he never reached an agreement with *anyone*, and specifically not with Arthur March," to murder the Levines, and that the "entire State-manufactured fantasy to murder the Levines was exclusively entered into between the government-tool informer, Farris, and Arthur March." (ECF No. 2, at 10.) He contends the jury instructions were misleading and confusing because they "permitted the jury to find Petitioner guilty in this conspiracy case by imputing to him the manufactured, heinous conduct and statements of Farris . . . , thereby making Petitioner guilty of conspiracy by virtue of the separate agreement between Farris and Arthur March." (*Id.* at 10–11.) Notwithstanding, the trial court specifically instructed the jury that "[t]he State is alleging the parties involved in this conspiracy are Arthur March and Perry March" (ECF No. 46-4, at 875, Trial Tr. 2026), and that the jury must find that at least one of the parties to the conspiracy "committed an overt act in furtherance of the conspiracy." (*Id.*) As discussed above, the evidence of record was sufficient to permit the jury to find that Perry and Arthur March conspired with each other to have a third party—Farris—murder the Levines, and that both Perry and Arthur intended the murder to take place even if they were not intending to commit the murder themselves, and both took one or more overt acts toward the execution of that objective. This Court remains persuaded that a rational jury was capable of wading through the evidence and reaching a reasonable conclusion that March was guilty of the offense of conspiracy to commit first-degree murder. March therefore has not shown that his conviction was "based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding." 28 U.S.C. § 2254(d)(2).

He is not entitled to relief on the basis of this claim, even if it is considered on the merits.

### C.      Ground Three: That the trial court erred in refusing to grant a mistrial

March argues that the trial court

erroneously refused to declare a mistrial where a key state witness, Lawrence Levine, . . . gratuitously and repeatedly introduced uncharged misconduct of the Petitioner into his testimony at trial, and *deliberately* told the jury that Petitioner had previously attempted to kill the witness and his wife, violating the Petitioner's right to a fair trial and to due

process of law, as guaranteed by the 5th, 6th and 14th Amendments to the U.S. Constitution.

(ECF No. 2, at 17.) The State contends that this claim, too, is barred by procedural default, because it was raised only on state-law grounds in the state courts. The Court, upon review of the record, agrees that March never argued in the state courts that the trial court's failure to grant a mistrial violated his right to due process under the Fourteenth Amendment. Instead, he argued that Lawrence Levine's statements violated the trial court's earlier ruling on a motion *in limine*, and he cited Tennessee case law regarding the applicable standard for granting a mistrial. (*See* ECF No. 47-1, at 75, Appellant's Br. 63 ("'The decision of whether to grant or deny a motion for a mistrial rests within the sound discretion of the trial court. A mistrial should be declared only upon a showing of manifest necessity. In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" (quoting *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004)).) The petitioner's appellate brief also quoted from Supreme Court and Sixth Circuit opinions, but only as illustrations of court opinions regarding the potential effect of character evidence on a jury and the policy reasons for excluding it during the prosecution's case in chief during a criminal trial. The appellant's brief cited to other federal case law—as well as to the writings of the poet Omar Khayyám—on the ineffectiveness of a curative instruction once the jury has heard information it should not have heard. Nowhere, however, did the petitioner argue that the failure to declare a mistrial amounted to a violation of his right to due process under the United States Constitution.

In ruling on the issue, the Tennessee Court of Criminal Appeals framed the issue in terms of state law, and cited only to state law, before ultimately concluding that the trial judge had not abused his discretion in refusing to grant a mistrial, on the basis that the defendant had not shown that the improper comments of Lawrence Levine created a "manifest necessity" for a mistrial. *State v. March*, 2010 WL 2219419, at *22.

Because the issue was framed only as one of state law in the state courts, and the petitioner failed to raise this issue in the state court under the same theory in which it is presented here, the issue is procedurally defaulted. *See Gray v. Netherland*, 518 U.S. 152, 163 (1996) ("[I]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court."); *Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If a habeas petitioner wishes to

claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."); *see also Anderson v. Harless*, 459 U.S. 4, 6 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." (internal citations omitted)). If the petitioner attempted now to raise the federal constitutional challenge in Ground 3 in a state petition for post-conviction relief, the claim would be barred from presentation to the state courts, because the petitioner failed to present the claim for determination on direct appeal when he had the opportunity to do so. Rule 4(a), Tenn. R. Crim. P; Tenn. Code Ann. § 40-30-106(g).

In short, because March never fully and fairly presented Ground 3 to the state courts in terms of a federal constitutional violation, and a state procedural rule prohibits the state courts from extending further consideration to the claim, it is deemed exhausted (since there is no "available" state remedy) but procedurally barred from federal habeas review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991). Moreover, March has failed to establish cause and prejudice or that he is actually innocent in order to excuse his procedural default. The petitioner is not entitled to relief on the basis of this claim.

    **D.    Claim Four: That the cumulative effect of the errors at trial rendered the petitioner's trial fundamentally unfair**

March also argues that the cumulative effect of the alleged errors rendered his trial fundamentally unfair such that his due process rights were violated. The State concedes that March raised this claim on direct appeal of his conviction and sentence. The Tennessee Court of Criminal Appeals found no merit to the claim, however, having found no other prejudicial errors, and March has failed to demonstrate that the state court's adjudication of the claim was contrary to or an unreasonable application of clearly established federal law. As explained herein, the petitioner has not established any of the constitutional errors he alleges; he therefore cannot show that cumulative error affected his right to a fair trial.

**IV.    CONCLUSION**

For the reasons set forth herein, the Court finds that March's petition is without merit. His claims for relief will be denied, and this matter dismissed.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. The petitioner may not take an

appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA must "indicate which specific issue or issues satisfy the [required] showing . . . ." 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when the petitioner demonstrates that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Courts should not issue a COA as a matter of course, but, at the same time, "a COA does not require a showing that the appeal will succeed." *Id.* at 337.

In this case, the Court finds that the petitioner has not made the requisite substantial showing of the denial of a constitutional right with respect to any of his asserted grounds for relief. Because any appeal by the petitioner would not warrant attention on the merits, the Court declines to issue a COA. March therefore may not pursue an appeal of this matter unless he requests and obtains a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), R. Gov'g § 2254 Cases; Fed. R. App. P. 22(b); 28 U.S.C. § 2253(c).

An appropriate order will enter.


_____
Kevin H. Sharp
United States District Judge